Last case this morning is the case of Chance v. Zinke. We haven't changed courtrooms. Case number 17-5057. Counsel, are you both ready to proceed? Yes, Your Honor. Yes, Your Honor. Ready to go then. We are ready to hear you. May it please the Court. My name is Don Lepp, and along with Logan James, we represent the appellant, Merrill Chance. Also sitting at the table with us is Mike Freeman, who represents the Pawnee Nation, the Amici, in this case. We've seated five minutes so they can discuss the exhaustion issues, which are important issues in cases involving the BIA. This is actually my third time before this Court in the past ten months. And each of these three cases involved instances where the BIA, the Osage agency of the BIA, utterly failed to conduct any NEPA analysis prior to approving leases and drilling permits. In fact, from 1970 until March 2015, the Osage agency had not conducted a single site-specific environmental assessment prior to approving any oil and gas activity, and that involves thousands of leases and drilling permits across the county. Now, in this case, the agency approved a lease assignment and two APDs in 1991 without any NEPA analysis whatsoever. My client acquired the property after his mother died in November 2015, and he filed suit less than a year later. The district courts. Counsel, could you, why don't we start with addressing the statute of limitations issues, the limitations issues first, to make sure the case is timely, and then we'll go back to the merits. Would you mind? I'm sorry. You'll have to. Are you saying we should address the exhaustion issue prior to the statute of limitations? No. The statute of limitations and then the exhaustion, don't you think? Don't we go to untimeliness first, whether it's timely? Yes, Your Honor. I was getting ready to segue into the statute of limitations. All right. Well, I misunderstood. I thought you might be going into the merits first. No. No, Your Honor. No, Your Honor. I apologize. The district court ruled that the case was barred by the statute of limitations. Right. And we believe that under the unique circumstances in this case, that it is subject to equitable tolling. And we think at a minimum that the court abused its discretion in not allowing us to conduct discovery into the issues that gives rise to our equitable tolling claim. And I would tell the court that this is not a fishing expedition. This is not a situation where we claim fraudulent concealment or concealment and we just made this up at a whole clock. One quick question on this discovery, because I like to take things one step at a time. You're saying you would like to have discovery on the facts that would establish equitable tolling, but those facts are exclusively known to you, aren't they, and to your clients? No, Your Honor. You're saying equity requires you to excuse our failure to file in a timely manner because blank, blank, blank. Isn't the because purely based on facts in your province? Absolutely not. They are completely in the province and they are in the possession of the BIA. The BIA withheld from the public, they withheld from the regional office, they withheld from headquarters, they withheld from oil and gas operators, and they withheld from landowners the fact that they were not conducting any NEPA analysis prior to conducting or approving any of these leases. This is information that they possessed and they tried to keep out of the public domain. But you're going to argue, I just want to make sure I understand your equitable tolling argument. Are you saying, what are you saying, that you didn't know and therefore couldn't file? You didn't know at any time during the limitation period that you had a potential claim and therefore didn't file and you didn't find out until the limitation, the period had run, the statute had run? There is not a single person in Osage County other than the people within the agency who are aware that the BIA was violating NEPA. This is not a situation where they would- Until the statute had run in full. That is correct. It was not discovered until my FOIA request that happened in 2014 in a case that was before this court back in September where we finally uncovered and it took pulling teeth to get the agency to provide any sort of NEPA documentation. The fact is they didn't have any NEPA information. So really, they were approving these leases and there was nothing for us to go and find because they weren't sending notice to us of the approvals. They simply, an oil operator would show up on your doorstep saying that, hey, we've been given the go-ahead to go out and drill this. And they went out and they drilled it. And I think if you look at the timeline and the documents that began at the Appellants Appendix 307, you'll kind of see how this unfolded. What prompted your FOIA request? What prompted my FOIA request, I tell you this is not in the record but in the case, and I'll be real quick, is we had a client who didn't want Devin to drill a well close to their property, and she was upset about it. And I told her, well, you know, the agency looked at this and approved it. It must be okay. And so I called the agency to get the NEPA documentation that I wanted to show to my client to say, hey, see, look, somebody looked at this. It'll be okay. And then when I called, they were very suspicious and wouldn't talk to me. And it makes you know we were in state court and I had to file a FOIA request. I couldn't get any of the information. And eventually we were able to get what they produced was a 1979 programmatic assessment. Okay. Well, what are the damages you're asserting here? We're not asserting. No, okay. Well, actually, if the court were to find that the leases and the drilling permits were void, we are seeking some damages not from the government but from the oil company for wrongful occupation. Okay. Because in our opinion, and we think this is backed up by another case that's been before this court, Hayes v. Chaparral, that the failure of the court to conduct any environmental assessment prior to approving these leases and these drilling permits renders them void. And for that basis, we would ask the court to first find that. So I guess my question is, you know, in order to assert equitable tolling, you have to have some due diligence. And there were plenty of opportunities, I would think, over these many, many years for someone to say, hey, I wonder if they did what they were supposed to do. And I guess my point is, does this just go on forever? Could you come in here 30 years from now and say, oh, I had a client and she was asking about this, so I did a FOIA request and I found out 50 years later? I mean, because that seems to be what you're saying. Is there no requirement that you exercise some other due diligence in this situation? Well, Your Honor, I think you need to look at the totality of the circumstances here. First of all, beginning in 2014 is the first time that the agency has actually been out in the open and said, hey, we're going to conduct environmental assessments. And I think if you look into the documents that I presented attached to my motion for leave to conduct discovery, you'll see that the regional office discovered that they were doing this in 2011, and they still chose to conceal it and chose to do nothing. They were going to wait until new regulations came out, hopefully in 2015. Well, conceal is kind of a difficult term for me to use, but I guess going back to the diligence, I don't see what would have prevented a FOIA request in 1995. Well, they don't provide any notice to anybody that the approvals have ever been conducted. Well, do you have to have notice to exercise due diligence to do your own inquiry and find out for yourself what happened here? I mean, the question is, is there an obligation on every single landowner to file a FOIA request every time somebody shows up to make sure that the NEPA analysis had been conducted? Importantly, we've got oil and gas operators, major oil and gas operators, who conduct operations all across the country on BLM land and BIA land where they have to do EAs. But when they come to Osage County, they don't have to. What was the agency telling them? That, hey, I know you have to do this everywhere else, but you don't have to do it here. And I think what they did was they lulled the landowners, the operators, and everybody else into inaction. And I think it's a little difficult to impose an obligation on a landowner to conduct a FOIA request every single time when the regional office doesn't even know. And we also have some documents in there that attach the motion for leave to conduct discovery that shows that even when we send a FOIA request, they're not forthcoming with all of the information, and it's heavily redacted. My time is here at an end, but I'm going to cede the balance of my time. You said what? I was going to cede the time to Mr. Freeman, but we would ask that the court reverse and... Was there any remaining time? No. All right, thanks. Thank you. May it please the court. Michael Freeman, appearing on behalf of the Pawnee Nation and Walter Echo Hawk. Thank you for allowing us to speak today. We filed our amicus brief because BIA has used its administrative appeal process like a shell game and in so doing has disregarded its obligations to tribes and individual Native Americans. The agency has repeatedly violated its own rules by not giving tribes and other interested parties notice of oil and gas approvals and then proceeding to implement those decisions on the ground. But when plaintiffs have challenged those decisions in court, BIA has reversed itself and sought dismissal of those cases for failure to exhaust administrative remedies even though the agency never gave plaintiffs notice of the decision or of the right to appeal that decision. In dismissing Mr. Chance's case, the district court here made two legal errors that also affect the Pawnee and many other stakeholders. First, the court erred by ruling that it couldn't review BIA's decisions because they weren't final agency actions until administrative appeals were exhausted. But after BIA approved these leases and permits, it allowed oil and gas drilling to take place on those leases and permits on the ground. In fact, there are operating oil and gas wells right now on Mr. Chance's land and under the Pawnee's land. And BIA's finality argument directly conflicts with its own treatment of these leases and permits by allowing drilling on them. The district court's finality ruling was also wrong because it failed to apply the Supreme Court's Darby v. Naros decision and this Court's ruling from last year in Farrell Cooper. Darby and Farrell Cooper held that where an agency action will already be operative pending an administrative appeal, that appeal is not required prior to judicial review under the APA. Essentially, what Section 704 of the APA says is that unless a decision is inoperative pending appeal, it's final for judicial review regardless of whether any appeal is filed. And requiring Mr. Chance and the Pawnee to pursue administrative appeals of a decision that's already in effect and already being implemented on their land is directly contrary to Darby and to Farrell Cooper. Now, BIA's rules also confirm that the approvals here were final agency actions. Normally, BIA allows a party 30 days to file an administrative appeal of its decision. And Section 2.6 of BIA's rules says that if no administrative appeal is filed during that appeal period, the BIA decision becomes final and effective. And that's what happened here with Mr. Chance. He didn't get any notice of the decisions and so he didn't file an appeal. BIA proceeded to treat those permitting and leasing decisions as final and began implementing them, which is why there are wells on that land right now. Now, there's a separate rule, Section 2.7, that does allow an appeal to be brought later in cases where BIA has failed to give the required notice of the decision. But 2.7 didn't prevent the decisions here from taking effect and becoming final. What Section 2.7 says is that a failure to give notice does not affect the validity of the action. And that's, I think, clear from the facts of this case, that the failure to give Mr. Chance notice didn't prevent the action from being effective or final or valid. They allowed it to proceed as if it were a final agency action. Finally, quickly, I'll talk about the second error that the district court made here, which was that its treatment of exhaustion as a jurisdictional requirement under the APA. Well-established case law from the Supreme Court and from numerous surrogates makes clear that neither the requirement of a final agency action or exhaustion more generally is jurisdictional. They're required for a cause of action, but that's not a jurisdictional question. In this court, BIA doesn't even defend the jurisdictional arguments it made below, and those arguments were flat wrong. What we'd ask, given that the agency has continued to raise those jurisdictional arguments in the district court, we'd ask the court to address them here to provide clarity for the lower courts and avoid future confusion. If the court has no further question, I'll cede the rest of my time. Thank you. Thank you. All right. I take it there's some reserved rebuttal time as well? There is not. All right. Then that'll go to rebuttal rather than ceding. All right. Your Honor, are you ready for me? Yes. We're ready to hear from you in snowy D.C. Yes. And I apologize for all of you went through to allow me to argue, but I thank you very much. Tamara Rountree for the United States. May it please the Court. Hold it. Hold it, please. We've identified that we have a delay back to the old technology where there is a delay in transmission. So if one of us wants to ask a question while you're talking, we'll raise our hand. If you see our hand go up, will you be able to alert to it? Yes. All right. Good enough. Go ahead. All right. I'll try to pause a little bit before I begin to speak so I make sure I hear what you say and you can hear what I'm saying. Hopefully this will work. It's my intention that I will take 13 minutes and leave the remainder for GSE's counsel. I would like to begin with the issue of notice. That's the ‑‑ allegedly it's lack of notice directly from BIA, and that is the ground on which Mr. Chance relies solely for, for example, not exhausting his administrative remedies, and he also relies on lack of notice as to the statute of limitations issue. There are at least four aspects in this case that show that Mr. Chance and his predecessor knew, should have known, or had constructive notice of the BIA approvals that they've challenged, even in the absence of any notice from BIA. I'll begin with the most telling aspects of the case, which show that Mr. Chance and his predecessor had this notice, had this knowledge before any on‑the‑ground activities began or before any approvals were issued for the well permits. We'll begin with the regulations at 25 CFR section 226.18. Those require that lessees and surface owners have actual and substantively significant interactions before any on‑the‑ground activities occur or before the well permits are approved. Now, Mr. Chance ‑‑ Before we get to that, I don't want to jump over whether there was, in fact, an obligation to conduct the NEPA analysis. Is that challenged? Do you challenge that? The ultimate, it's within the agency's discretion as to what level of NEPA analysis is conducted. And the argument here is that site-specific NEPA wasn't conducted and site-specific was not done for the lease assignment and the two well approvals here. But I just would like to make a point that, as far as I can tell, the only allegation that seems to be made by Mr. Chance as to NEPA is simply that site-specific NEPA wasn't done. It's not clear how they've been injured by the lack of that procedural document or the procedural activity under NEPA occurring. Their allegations of harm seem to be limited to surface damages on the land. So I'm still not clear as to actually what the injury is under NEPA simply other than stating site-specific wasn't done, which I only read as an articulation of the violation and not actual harm. But getting back to the point of notice as to what Mr. Chance and his predecessor knew ahead of time, Mr. Chance doesn't allege that GSE failed to comply with these regulations for interaction with the surface owner. And what the regulations require is that before any on-the-ground actions occur, that the lessee must meet with the surface land owner. At that meeting, the lessee must indicate to the surface land owner where the wells will be located. The lessee must also tell the land owner what the routes of ingress and egress will be. Likewise, the lessee must tell the surface land owner what the procedures will be for the settlement of surface damages that might ensue from any of the operations. Also, the regulations require that before commencing any actual drilling, the lessee must pay the surface owner commencement fees for every well. And on the lessee's drilling permit application, which ultimately is then submitted to BIA for approval, the lessee must indicate the following information, the name of the surface owner, the amount of commencement money paid, and the date on which that payment was made. I refer the Court to the Pelley's Appendix at page 5050, which shows an example of the permit application, and it does indeed have that information. That information that the lessee, GSE, acquired before submitting its permit approval indicates that there was this substantively significant interaction between Mr. Chance's predecessor and GSE before any actions occurred on the ground or before the approvals were issued. So what this shows is that there's no dispute that before anything happened on the ground, Mr. Chance and the lessee met. And perhaps more importantly, it establishes that this lack of notice that Mr. Chance is relying on as excusing his failures in this case didn't function as an absolute and complete bar to him knowing of or participating in the administrative proceedings or exhausting his remedies, his administrative remedies, or for that matter, for bringing the legal challenge. And for that reason, notice isn't a justifiable ground for excusing his behavior or his failures. As to, I just would like to echo Judge Moritz's point about due diligence here. The fact finder in this case made findings that Mr. Chance or his predecessor, notwithstanding the information that was gleaned during these interactions that occurred before the approvals were rendered or before any on-the-ground activities occurred, notwithstanding that neither Mr. Chance or his predecessor ever went to BIA and said, well, let alone that we've had these discussions, but even if they said we've heard or we see that there's equipment on our land, have any approvals been issued, there was no sort of diligence exercised in that way, nor were any pleadings filed, which is relevant for the statute of limitations. So, indeed, the district court found that there was no. But you've argued that it just seems to me, it's confusing to me, you're arguing that prior to the commencement of any drilling, there would have had to have been these pre-drilling conferences with the landowners, with the surface owners, and that those occurred, that that conversation in fact occurred. You've argued that. Yes. The point is that Mr. Chance has never alleged that GSE failed to comply with all of those regulatory requirements. Is that the proof of compliance, or is there additional proof of compliance as to this conference? Well, what we have, proof of In other words, is the proof of compliance merely that the statute exists and that there's been no allegation that the statute wasn't complied with, or is there some extrinsic or direct additional evidence that, in fact, it was done? Well, there is additional. Well, the district court made specific factual findings as to the interactions between GSE and Mr. Chance's predecessor, one of which is the court found that Mr. Chance's predecessor accepted and deposited commencement fees received from GSE, and these are fees that are paid before the operations begin. The district court made the factual finding that GSE negotiated with Mr. Chance's predecessor as to payments related to the drilling operations and any surface damages that might ensue, and the district court also determined that GSE, once it entered onto Mr. Chance's land, pursuant to the lease and fulfilling or completing or conducting the drilling operations, once they were onto his land, it was open and notorious, and Mr. Chance doesn't challenge any of those findings. So it's only reasonable to conclude that we have an entire set of regulations that GSE had to fulfill. Mr. Chance never disputes that they did. We have a document at appendix page 50 that indicates that the approval that GSE submitted to BIA showed Mr. Chance's name the amount of commencement fees paid. So approval had to occur after these interactions already occurred. So we have that coupled with what the government has already argued in its brief as to what Mr. Chance has known by constructive notice or by having acquired lands that from the very moment they were acquired have been subjected to government regulations and to the unique regulations that are involved with the Osage Mineral Estate. So he's charged with knowing the regulations and the laws. And the regulations are very clear. And to back up, the regulations are and have been available. The regulations are clear as to what the administrative proceedings are, what the approval process is. There's nothing here that Mr. Chance wasn't able to get his hands on that at the very least made him scratch his head and think, what might I be subjected to? And now that we have a disputed district court finding that Mr. Chance's predecessor got a check and accepted a check for commencement fees for drilling operations on its property, it's not reasonable to say that Mr. Chance can hop in a corner and say, but we didn't get a piece of paper directly from BIA saying that they approved the well permit. That's not, that alone didn't prevent Mr. Chance or his predecessor from knowing what was occurring and at least taking some steps to find out more if they deemed it appropriate or necessary. Did you argue standing? Is there a standing issue? You say it to everyone's predecessor that presumably the injury would have been to his predecessor. Prudential standing, I guess. Of Mr. Chance, Mr. Chance's. It's not clear, it's not clear as to whether Mr. Chance lived on the property or was there at the time of his parents. And to be honest, we just, we grouped the two together, the predecessor and Mr. Chance. Well, I noticed you did in all your language. I just wondered if you ever thought about whether there might be an issue there, particularly since he did accept a check and the predecessor. Understood. You never, there's no standing issue here. To be honest with you, we've not argued it thus far, and I can't fully articulate one right now. Not saying that it's not there, it's just that I'm. It's not in your brief. I'm just asking. Yeah, it's not in the brief, that's correct. As to, let's see, if there are, I would like to maybe just give your Mr. Chance to ask me additional questions before I make sure there's not anything in particular that I wanted to point out. And before I cede my. I have a question about the ANDIPA analysis. You said there was no specific, site-specific analysis. Was there an overall analysis that covered the entire nation? Yes, yes. Or the territory in the nation that was subject to drilling? That's correct. And how many years. That's correct. How many years before was that conducted? I apologize, Your Honor. I'm going to say, I don't know, I won't guess, I won't guess. And I believe it's in the briefs at some point. I do not know the exact date. But that is correct. It was done before the activity of this land. Indeed, Your Honor. Thank you. Before I do step down, I just wanted to point out in Mr. Chance's reply brief at footnote one, he refers to arguments that were made by the government that he didn't respond to in his brief to this court. He relies on his district court pleadings. And I'd just like to point out that this court has already stated, for example, in U.S. v. Ackerman at 831 F. 3rd, 1308, that that sort of incorporation by reference does not preserve an issue for review by the court. I will cede the rest of my time to GSE's counsel. Counsel, she generously gave you another 20 seconds. I see that. May it please the court, I'm James Sicking, and I'm here to represent Great Southwestern Exploration. And I can clarify for you, the countywide environmental assessment was performed in 1979. These permits were issued in 1990, 1991. So it's not likely that these families would have known about the previous analysis. Well, I'm not willing to concede that from the standpoint that back in 1979, the countywide environmental assessment was performed by order of the northern district in Tulsa, pursuant to two lawsuits that were in front of them regarding NEPA. And so they came in and performed a countywide assessment. So depending on the chances level of involvement in the county, they would have known that their property was part of this environmental assessment. With regard to the standing question, I think we just rolled that into our statute of limitations issue. This was so far ago, or so long ago, that we really, it's hard to defend. That's part of the reason for the statute of limitations, is it's hard to defend yourself against these accusations as witnesses die and papers get lost. But I'm out of time. Well, do you have any other point? Because I want to extend some additional time for rebuttal to the appellants. Not much, but I don't want to cut you off. I was just here for questions that maybe you might have had that were specific to GSE. A hearing none. I think we understand your case and we thank you for your appearance. Thank both of you. You had 49 seconds. We'll add, or I guess 16 seconds. So we'll add two minutes to that to give you time to summarize your case and finish. Thank you, Your Honor. Just in response to the government, the commencement money is a red herring. They are relying on conduct by a private party to justify their failure to give notice. It seems to me that the regulation and the laws impose an obligation on the government to provide notice of all written decisions to interested parties. Now they're coming in here and telling you, well, this other guy did this and this other person did that, so let's forget about it. And then also I do want to point out that counsel kept referring to appellate index 50 for proof that some meeting had occurred. If you look at appellate appendix 50, that is well number five, which isn't even an issue. You need to look at 39 and 42, which is wells three and four. Another issue that I'd like to address is the idea of, oh, well, it's just a procedural injury. Well, that's what NEPA is. It's a procedural statute. The law requires that the government conduct the NEPA analysis before they do the approval. It's like you have to take the driver's test before we can stamp the driver's license. You have to do the analysis before we give you the approval. And if she wants to see injuries, we've attached those to the complaint. There are significant environmental contamination. In fact, we sued them in state court and obtained actual punitive damages just two weeks ago because of the environmental contamination on the chances property. One other issue I'd like to raise when we're talking about the due diligence that was raised earlier, if you look at the assignment work papers that I got from the OIG through the FOIA request, you'll see something very interesting in there, is that when the Cattlemen's Association attempted to get all of the NEPA work, because they were concerned that maybe this wasn't happening, and this is the first time that I'm aware that anybody tried to, you know, that they were stumbling onto this and thinking, hey, you know, maybe they're not doing things right. They sent a FOIA request, and the Cattlemen's Association is a non-profit association. And what do they get back? They get back a $5,000 bill when they should have been exempt. And so then they appeal that. And to this day, five years later, that appeal is still pending in D.C. I mean, I think there is evidence already in the record that the BIA, the OSAGE agency, has bent over backwards to keep this from the public domain that they were not following through. They were not complying with NEPA. And then finally, I would indicate. Thank you very much. Okay. Unfortunately, your time has expired. Okay. But the case is well understood on the briefs and the arguments, and we thank counsel. Counsel are excused, and the case is submitted, and the Court is in recess until our next term or until further call. The Court will advance the recess.